IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DON SCOTT IRVINE,

        Plaintiff,

   v.

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,

        Defendant.

No. 3:14-cv-00197-HZ

OPINION & ORDER

William J. Macke
Law Offices of William Macke
4411 NE Tillamook St.
Portland, OR 97213

    Attorney for Plaintiff

James E. Cox, Jr.
United States Attorney's Office
District of Oregon
1000 SW Third Ave., Ste. 600
Portland, OR 97204

    Attorney for Defendant

1 - OPINION & ORDER

HERNÁNDEZ, District Judge:

Plaintiff Don Scott Irvine filed this action against Defendant, the United States Department of Veterans Affairs ("VA"), alleging medical malpractice in connection with treatment Irvine received for neck, shoulder, and arm pain. Currently before the Court is the VA's motion for summary judgment [33]. Irvine conceded that the Court does not have jurisdiction over his claims challenging the VA's handling of his request for veteran's benefits. He also failed to produce expert evidence about the treatment he received from the VA prior to 2011. Irvine has, however, produced sufficient evidence regarding the course of treatment the VA should have provided him to comply with the standard of care when treating his neck pain in 2011. Accordingly, the VA's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

Irvine began experiencing neck, shoulder, and arm pain in 2003 after he was in a motor vehicle accident while serving on active duty in the United States ("U.S.") Army. Cox Declaration ("Decl.") Exhibit ("Ex.") 1, ECF No. 34-1, at 2. On November 19, 2003, an Army neurosurgeon performed a C5-C6 anterior discectomy and fusion ("ACDF") surgery without hardware, meaning the surgeon used a bone graft to foster fusion of the vertebrae instead of a synthetic device. Defendant's Motion ("Def. Mot.") at 3. After the surgery, Irvine continued to suffer from arm and shoulder pain and was eventually discharged from the military for medical reasons. Id.; First Amended Complaint ("First Amd. Compl.") Ex. 2, ECF No. 9-4, at 1.

Irvine lived in Hawaii from 2004 and 2007. Cox Decl. Ex. 1, at 3–4. He then returned home to Vancouver, Washington and in 2008 began receiving medical care at a U.S. Department of Veterans Affairs facility there. Cox Decl. Ex. 3, ECF No. 34-3, at 1. He complained of "sudden shooting pains" from his lower neck during a February 2008 visit with Dr. Paul

Halgason, his VA primary care provider. Id.  X-rays indicated that his C5 and C6 vertebrae were successfully fused. Cox Decl. Ex. 4, ECF No. 34-4, at 2. Dr. Halgason followed up with Irvine about a month later, but Irvine reported the episodic shooting pain had not recurred. Cox Decl. Ex. 5, ECF No. 34-5 at 2.

Irvine began experiencing "throbbing," sometimes "sharp and painful spasms" in his neck again in September of 2010, and "constant" shoulder pain with flare-ups that affected his sleep. Cox Decl. Ex. 7, ECF No. 34-7 at 1–2. In December of 2010, Irvine visited an orthopedic specialist for the shoulder pain, but the VA orthopedist referred him to a VA neurosurgeon because his symptoms did not "seem consistent with localized shoulder pathology." Cox. Decl. Ex. 8, ECF No. 34-8, at 5.

Irvine visited the VA neurosurgery clinic in Portland, Oregon, on March 1, 2011. Cox Decl. Ex. 9, ECF No. 34-9, at 1, 3. The examining resident, Dr. Brian Farrell, diagnosed herniated discs at the C4-C5 and the C6-C7 levels, along with a nerve root impingement at the C6-C7 level. Id. at 5. Doctor Justin Cetas agreed with Farrell's recommendation that Irvine undergo another neck surgery, this time to fuse the C6 and C7 vertebrates to "decompress the spinal cord and the R C7 nerve root." Id. Dr. Cetas performed the C6-C7 ACDF procedure on June 13, 2011; he used a plastic cylinder device to foster bone fusion. First Amd. Compl. Ex. 4, ECF No. 9-6, at 1–2.

Unfortunately, Irvine's symptoms did not improve after surgery. Although the VA neurosurgery clinic was providing his post-operative treatment in 2012, Irvine visited with Dr. Jung Yoo, a spinal surgeon at Oregon Health & Science University ("OHSU") to explore other options. Def. Mot. at 4. Dr. Yoo diagnosed a "nonunion or failure to heal from previous surgery" at the C5-C6 and C6-C7 vertebrae—the levels that were fused in the 2003 and 2011 surgeries.

3 - OPINION & ORDER

Dr. Yoo eventually recommended surgery to fuse the vertebrae from C4 to C7, and he performed the three-level fusion surgery at OHSU on April 3, 2012. First Amd. Compl. Ex. 3, ECF No. 9-5, at 5–6, 12–13. Irvine testified that he still experiences pain in his shoulder and arm, but that Dr. Yoo's surgery "changed the quality of life a little bit also." Cox Decl. Ex. 1, ECF No. 34-1, at 6.

Irvine filed a *pro se* complaint against the VA in February of 2014, and his First Amended Complaint, now the operative pleading, in March of 2014. Irvine alleges that the "Department of Veterans Affairs failed to provid[e] medical care in a timely [manner] that cause[d] permanent damage" to his spinal cord and extremities. First Amd. Compl. at 3. He contends that VA doctors were slow to diagnose symptoms and failed to recognize the nonunion of his C5-C6 vertebrae at the time of his 2011 surgery. Id. at 3–4. In October of 2014, Mr. William J. Macke made his first appearance on behalf of Irvine, and he is now the attorney of record.

The VA moves for summary judgment and offers three different arguments for why Irvine's claims fail as a matter of law. First, the VA contends that Irvine has failed to produce sufficient expert testimony to show either that the VA doctors failed to meet the standard of care, or that the alleged breach of the standard of care caused Irvine's injuries. Def. Mot. at 7–10. Second, the VA argues that Oregon's statute of repose substantively bars Irvine's claims arising from any act or omission that occurred before February 6, 2009. Id. at 11–14. Finally, the VA asserts that Irvine's fourth claim for relief challenges a VA benefits decision that this Court does not have jurisdiction to review. Id. 14–16.

Irvine's response in opposition to the motion for summary judgment appeared to concede that the VA benefits issue falls outside the Court's jurisdiction, and Irvine's counsel confirmed that concession at oral argument. See Plaintiff's Response ("Pl. Resp.") at 1. Moreover, Irvine

did not offer an expert opinion that a VA physician breached the standard of care prior to 2011, therefore the Court does not reach the question of whether Oregon's statute of repose forecloses any of Irvine's claims. Given Irvine's concession and the lack of evidence about the standard of care regarding the treatment he received at the VA before 2011, the VA's motion for summary judgment is granted as to Irvine's second and fourth claims for relief.

The sole remaining issue to resolve is whether Irvine's proffered expert testimony, after being construed in his favor, is sufficient to create a genuine issue of material fact about whether a VA doctor violated the standard of care in diagnosing, treating, and ultimately performing surgery for his neck pain in 2011, and if so, whether that violation caused Irvine's injury.

## STANDARDS

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927–28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

## DISCUSSION

Irvine alleges that medical providers at the VA were negligent in attempting to treat his neck, back, and arm pain. The Federal Tort Claims Act ("FTCA") waives the Government's sovereign immunity for, among others, "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment[.]" 28 U.S.C. § 1346(b)(1). The law of the state in which the alleged negligent act occurred controls actions brought under Section 1346. See 28 U.S.C. §§ 2672, 1346(b)(1); Bond v. United States, No. CIV. 06-1652-JO, 2008 WL 655609, at *1 (D. Or. Mar. 10, 2008).

To succeed on a medical malpractice claim under Oregon law, Irvine must show "(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) causation, i.e. a causal link between the breach of duty and the harm." Swanson v. Coos Cnty., No. CIV. 08-6312-AA, 2009 WL 5149265, at *5 (D. Or. Dec. 22, 2009) (quoting Stevens v. Bispham, 316 Or. 221, 227, 851 P.2d 556, 560 (1993)). As a general rule, a plaintiff in a medical malpractice case must provide expert testimony on the standard of care and causation, because those issues are typically outside a layperson's understanding. Chouinard v. Health Ventures, 179 Or. App. 507, 512 n.2, 39 P.3d 951, 953 (2002); see also Clark v. Am. Nat. Red Cross, No. CIV. 04-765-HA, 2006 WL 696256, at *3 (D. Or. Mar. 16, 2006) (citations omitted)).

Irvine offered a written opinion letter from Dr. Michael A. Steingart, a board-certified orthopedic surgeon, in which Dr. Steingart analyzed whether Dr. Cetas's 2011 surgery on Irvine's C6-C7 vertebrae met the standard of care. Cox Decl. Ex. 12, ECF No. 34-12, at 3–4. Dr. Steingart "reviewed the cervical operative report and did not identify a level of care issue with regards to his surgery." Id. at 3. But Dr. Steingart identified a potential violation of the standard of care if Dr. Cetas failed to diagnose the non-union of Irvine's C5-C6 vertebrae before performing the 2011 surgery to fuse the C6-C7 vertebrae. He wrote the following:

> However I do not have a clear understanding as to why Dr. Jung Yoo on 4/3/12 identified a non-union at the C5-C6 level, which was fused in 2003. Mr. Irvine exhibited radicular complaints and had nerve damage from the protruding disc at the C6-C7 level as reported by Dr. Brian Farrell[,] a neurosurgical resident on 3/1/11. Dr. Farrell under the guidance of Dr. Cetas reviewed the MRI scan which reported right greater than left foraminal narrowing from a 6-C7 lesion. The C5-C6 level was not addressed as a union or a fusion on an x-ray dated 2/7/2008. It noted, "Loss of height of the superior endplate . . . ." An 11/4/11 MRI scan (post C6-C7 fusion), reported, "Profound loss of disc height demonstrated at the C5-C6 level. **The radiographs I reviewed were not clear, as to whether or not C5-C6 was fused. I was only offered 2012 radiographs of flexion and extension views. If indeed the bone non-union was not identified at the time of the C6-C7 fusion [in 2011] that would be considered below the standard of care.**

Id. (emphasis added). Dr. Steingart could not verify Dr. Yoo's diagnosis that Irvine's 2003 surgery failed to actually fuse the C5 and C6 vertebrae. But if those two vertebrae were, in fact, not fused when Dr. Cetas performed the 2011 surgery to fuse the C6-C7 level, then, at least in Dr. Steingart's opinion, Dr. Cetas violated the standard of care by not identifying the problem at C5-C6.

The VA argues that, even assuming Dr. Steingart's opinion is true, Irvine has failed to produce sufficient evidence to survive summary judgment. See Def. Reply at 2–4. In a medical malpractice case based on a theory of the defendant's nonfeasance, i.e. a "failure to diagnose," a plaintiff must allege facts that, if proved, will establish "circumstances which rendered the

7 - OPINION & ORDER

failure harmful." Moser v. Mark, 223 Or. App. 52, 58, 195 P.3d 424, 427 (2008) (citation omitted); see also Horn v. Nat'l Hospiatl Ass'n, 169 Or. 654, 670, 131 P.2d 455, 461 (1942) (explaining that in a failure to diagnose case, "the last necessary element in the chain of causation is that the absence of medical or surgical treatment at that time resulted in damage which would not have occurred if the treatment had been administered."). In other words, Irvine must produce evidence about the course of treatment the VA should have taken had it properly diagnosed the C5-C6 non-union. Def. Reply at 3. ("Dr. Steingart's opinions are still not sufficient for [Irvine] to avoid summary judgment . . . because [of his] inability to offer an opinion as to how the standard of care would have required different *treatment* following further *diagnostic* workup[.]").

While it may be true that Dr. Steingart's opinion letter, quoted above, does not establish the required link between the failure to diagnose and the treatment VA doctors should have followed, the Court finds other evidence in the record sufficient to create a question of fact on this issue. At his deposition, Dr. Steingart confirmed his belief that, in regards to Dr. Cetas's failure to diagnose nonunion at C5-C6 in 2011, "there was enough in the medical record to suggest a further work-up[,] such as a CT scan or a bone scan[,] to look at the C5-6 level[.]" Supplemental Cox Decl. Ex. 1 at 12–13. Dr. Steingart then explained that Dr. Yoo's fusion surgery is the "treatment of choice for non-unions." Id. at 13. He later again asserted that a neck fusion surgery is "the standard treatment" that follows the identification of a non-union after surgical intervention. Id. at 14. Construing that evidence in Irvine's favor, as the Court is required to do here, Dr. Steingart's testimony tends to show that there is, in fact, a course of treatment typically followed after identifying a non-union. That is all Irvine must do to survive

8 - OPINION & ORDER

summary judgment, and accordingly, the VA's motion for summary judgment is denied as to Irvine's first and third claims for relief.

The VA attempts to undermine Dr. Steingart's opinion by arguing that he is an orthopedic surgeon, not a neurosurgeon, and thus he is not qualified to testify about the standard of care for neck surgeries. Def. Mot. at 5. That argument, however, goes to the weight of Dr. Steingart's opinion, not its sufficiency; it will be up to the jury as the finder of fact to determine how to balance Dr. Steingart's testimony against the other experts and evidence at trial.

## ORDER

For the reasons stated, the VA's motion for summary judgment [33] is GRANTED in part and DENIED in part. As to Irvine's second and fourth claims for relief, the VA's motion is granted and those claims are dismissed. The VA's motion is denied, however, on Irvine's first and third claims for relief.

IT IS SO ORDERED

Dated this ___29___ day of ___June___, 2015.

_____
MARCO A. HERNÁNDEZ
United States District Judge