IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

DON SCOTT IRVINE,

                Plaintiff,

     v.

UNITED STATES DEPARTMENT OF
VETERANS AFFAIRS,

                Defendant.

No. 3:14-cv-00197-HZ

FINDINGS OF FACT &
CONCLUSIONS OF LAW

William J. Macke
Law Offices of William Macke
4411 NE Tillamook St.
Portland, OR 97213

    Attorney for Plaintiff

James E. Cox, Jr.
United States Attorney's Office
District of Oregon
1000 SW Third Ave., Ste. 600
Portland, OR 97204

    Attorney for Defendant

HERNÁNDEZ, District Judge:

Plaintiff Don Scott Irvine filed this Federal Tort Claims Act action against Defendant, the United States Department of Veterans Affairs ("VA"), alleging medical malpractice in connection with treatment Irvine received for neck, shoulder, and arm pain at the Portland Veterans Affairs Medical Center. Irvine's Amended Complaint alleged four separate claims; the Court granted summary judgment in favor of the VA on Claims 2 and 4. Irvine v. U.S. Dep't of Veterans Affairs, No. 3:14-CV-00197-HZ, 2015 WL 3986490, at *5 (D. Or. June 29, 2015). Irvine's remaining claims allege that when VA doctors performed a neck surgery on Irvine in 2011, they failed to diagnose and treat a so-called "nonunion" of his vertebrae from a 2003 neck surgery. Irvine alleges that the VA doctor's conduct fell below the standard of care, which caused him to suffer worsening symptoms and permanent injury, and to incur additional medical expenses after Irvine sought treatment outside of the VA to alleviate his neck and arm pain.

The Court conducted a two-day bench trial on September 1 and 2, 2015. These are the Court's Findings of Fact and Conclusions of law. FED. R. CIV. P. 52(a)(1). After examining the exhibits, hearing testimony at trial, and evaluating the witnesses' credibility, the Court finds it more probable than not that Irvine's vertebrae had fused at the site of the 2003 surgery at the time VA doctors operated on his neck in 2011. Moreover, even assuming Irvine had a nonunion, the Court concludes that the VA medical providers did not breach the standard of care in failing to diagnose it, because Irvine was not exhibiting symptoms consistent with nonunion and radiographic images of his neck did not indicate nonunion. Therefore, the Court finds in favor of Defendant on all of Irvine's claims.

//

//

# FINDINGS OF FACT

1. Irvine's Neck Injury and Treatment

Plaintiff Don Scott Irvine is a 45 year old veteran of the United States Army who has received medical care from the Department of Veterans Affairs ("VA"). While serving on active duty in Iraq in 2003, Irvine was injured in a motor vehicle accident when the vehicle in which he was riding rear-ended another vehicle, and the force of the collision threw Irvine into the vehicle's ceiling. Following the accident, Irvine began experiencing neck, shoulder, and arm pain. A magnetic resonance imaging ("MRI") scan revealed a significant herniated disc between the fifth and sixth cervical vertebrae of his neck (the "C5-C6" vertebrae), which was compressing his spinal cord.

On November 19, 2003, an Army neurosurgeon performed an anterior discectomy and fusion ("ACDF") procedure on Irvine's neck at the C5-C6 level. A discectomy is the surgical removal of herniated disc material that is pressing on a nerve root or spinal cord. An ACDF is a surgical procedure to treat nerve root or spinal cord compression by removing the herniated disc and filling the open space with a bone graft or synthetic device to prevent the vertebrae from collapsing. The joining of the vertebrae around the graft or device is called "fusion." The Army surgeon performed the ACDF procedure without hardware, meaning that surgeon used a bone graft, not a synthetic device, to foster fusion between Irvine's C5 and C6 vertebrae. (Defendant's Exhibit ("Def. Ex.") 501.)

Irvine continued to experience neck, shoulder, and arm pain after the 2003 fusion surgery, and he received a medical discharge from the Army. Irvine lived in Hawaii from 2004 to 2007. During that time, he experienced arm and chest pain while exercising, for which he saw a family care doctor and visited the emergency room.

He returned home to Vancouver, Washington in May of 2007, and began receiving care for his neck and arm pain at the VA facility in Vancouver and at the Portland VA Medical Center ("VAMC"). A September 2010 cervical x-ray "demonstrate[d] stable interbody fusion [at] C5-C6." (Def. Ex. 502.) On February 22, 2011, VA Neuroradiologist Dr. Jack Simon compared a new MRI of Irvine's cervical spine with previous images and noted that the "C5-C6 interspace is abnormal similar to the prior study." Dr. Simon also wrote that the cervical discs between the fourth and fifth and the sixth and seventh vertebrae (the "C4-C5" and "C6-C7" levels) were herniated and that the C6-C7 disc was impinging on the nerve roots. The MRI did not show any spinal cord compression. (Def. Ex. 503.)

On March 1, 2011, neurosurgery resident Dr. Brian Farrell examined Irvine at the Portland VAMC. Irvine reported that he was experiencing pain in his neck that radiated down his arm and into his palm and fingers. Irvine testified that the pain went down the back of his neck, across his shoulder blade, down the back of his arm, and out his thumb. He described a sensation of "shooting spikes going down through my arm." He also reported some weakness in his hand, but denied any difficulties with walking, or bladder and bowel control. Dr. Farrell noted the disc herniations at the C4-C5 and C6-C7 levels that were apparent on Irvine's most recent MRI. Dr. Farrell wrote that "[w]e will plan on a C6/7 ACDF to decompress spinal cord and the R C7 nerve root." Dr. Cetas, who was acting chief of neurosurgery at the time, reviewed Dr. Farrell's diagnosis, and agreed with the suggested treatment. (Def. Ex. 504.) Dr. Cetas performed the C6-C7 ACDF procedure on Irvine's neck on June 13, 2011, with the assistance of Dr. Hai Sun and physician's assistant Cynthia A. Bohan. Dr. Cetas removed Irvine's C6-C7 disc, then inserted a synthetic device called an "LDR spacer" to maintain the space between the vertebrae and foster boney fusion. No complications arose during the procedure. (Def. Ex. 508.)

On June 28, 2011, Irvine returned to the Portland VAMC for a post-surgery follow up. He reported some relief from his symptoms, but he also reported continued weakness in his hands, and "some jerkiness in his arms that he did not have preoperative." Irvine stated that some of the pain symptoms had decreased, especially those in his right forearm, but that he was now experiencing radiating pain down the back of his arm. (Def. Ex. 509.) Irvine visited with Ms. Bohan again in September of 2011, and reported that his neck pain was improved, but that he still had weakness in his hands and "shards of glass like shooting pains down [his] right arm to elbow, prior to surgery this continued to his right thumb." Irvine also endorsed fecal urgency and that he had two accidents since surgery, though he denied bladder incontinence or urgency. (Def. Ex. 511.)

Dr. Cetas and the neurosurgical team at the Portland VAMC used a number of different diagnostic techniques and modalities to try to identify the cause of and to alleviate Irvine's symptoms, including a post-operative cervical MRI, an electromyography (EMG) test, physical therapy, and referring him for evaluation in a pain clinic. (Def. Exs. 512–514.) Despite these efforts, Irvine grew frustrated with the care he received at the Portland VAMC. He testified that he was tired of "being shuffled around with so many different doctors at the VA," and that he "didn't really trust what was going to be happening to me, their choices, their decisions." He visited Northwest Pain Network; providers there prescribed gabapentin for his pain and recommended Irvine visit Dr. Jung Yoo, an orthopedic surgeon at Oregon Health Sciences University ("OHSU") for a second opinion about his symptoms. (Def. Ex. 516.)

Irvine visited Dr. Yoo at OHSU in February of 2012. As part of that visit, Irvine had another series of x-rays taken of his neck in February of 2012. Dr. Erik Foss, an OHSU radiologist, interpreted the x-rays as indicating "osseous interbody fusion at C5-6." (Def. Ex.

515.) Dr. Foss also noted "C6-7 ACDF without complication," and "C4-5 degenerative disk disease." Dr. Foss testified that "osseous interbody fusion" meant that he saw bone growing in the space between Irvine's C5 and C6 vertebral bodies.

After interviewing Irvine and conducting some tests, Dr. Yoo assessed a "nonunion of C6-7 and degeneration and foraminal stenosis of C4-5." His recommended treatment was another neck surgery—a fusion of Irvine's C4 through C7 vertebrae and "foraminotomies at C4-5 and C6-7," using a posterior approach (the opposite direction from Irvine's previous surgeries). (Def. Ex. 516) (capitalization added). Dr. Yoo performed the three-level posterior fusion surgery on Irvine's neck on April 3, 2012, without complications. To provide stability and foster fusion of Irvine's vertebrae, Dr. Yoo utilized a "Depuy Mountaineer" system which he implanted on the back of Irvine's spine using a number of titanium screws and rods. (Pl. Ex. 7.)

Irvine testified that the Dr. Yoo's surgery gave him "some relief, but I still have pain in my forearms and pain that . . . shoots out my thumb." Although the pain was similar in location and in intensity, Irvine testified that it occurred less frequently than before Dr. Yoo's surgery. Irvine also testified that the relief he received from Dr. Yoo's surgery has helped with some of his psychological symptoms, and that he is able to do some of the activities he used to do, such as walking his dog and doing artwork, within the limitations imposed by his surgeries and implanted neck hardware.

2. Medical Testimony

Dr. Cetas testified about the ACDF procedure he performed on Irvine's neck at the C6-C7 level in 2011. At the time of the surgery, Dr. Cetas was acting chief of neurosurgery at the Portland VAMC; he also works at the neurosurgery department at OHSU. As a resident at OHSU between 2002 and 2009, Dr. Cetas estimated that he performed 300 spinal surgeries. Since then,

he estimated that he has conducted about 300 to 400 spinal surgeries per year. Dr. Cetas testified about how he came to the decision to perform the ACDF procedure at Irvine's C6-C7 level. He explained that MRI images of Irvine's neck indicated significant nerve root compression and some spinal cord crowding at the C7 level, mild nerve root compression at the C4-C5 level, and no compression of the nerve root or spinal cord at the C6 level. He then explained that Irvine was complaining of pain then went down his neck, into his thumb and forefinger, along with some loss of grip strength, and had demonstrated some subtle motor weakness. Dr. Cetas explained that these symptoms were consistent with a C7 nerve root impingement. Taken together, the images showing compression at C7 and Irvine's reported symptoms suggested to Dr. Cetas that surgery at the C7 level was the best way to try and alleviate Irvine's symptoms. Dr. Cetas agreed with Irvine's lawyer that problems with C6 nerve root could also cause radiating pain down the patient's arm and into the thumb. But Dr. Cetas also explained that the distribution of sensation from nerve fibers at the different levels will often overlap, and thus a proper diagnosis must correlate the patient's complaints with evidence of nerve compression that can be seen on imaging. In Irvine's case, Dr. Cetas explained, the imaging showed compression at C7 and no ongoing compression at C6. The C7 root could have contributed to his thumb pain, but was clearly contributing to the pain in his forefinger and probably contributing to the pain radiating down his arm. Thus, Dr. Cetas concluded that surgery to reduce compression at the C7 level was the best way to try and alleviate Irvine's symptoms with the least invasive procedure possible.

  Dr. Cetas testified that he did not see any reason to believe that Irvine's previous surgery at the C5-C6 level had resulted in nonunion. Irvine was not demonstrating the typical symptoms of a nonunion, which include localized mechanical neck pain that can sometimes radiate up into the patient's head. Dr. Cetas stated that he saw indicators of bony fusion at the C5-C6 level in

plain film x-rays of Irvine's neck. In response to questions from Irvine's attorney about the apparent "obliteration of disc space" between Irvine's C5 and C6 vertebrae, Dr. Cetas explained that was a very common result of a fusion surgery, like Irvine's 2003 procedure, which uses a bone graft and not an implant to foster fusion—the bone graft "subsides," or breaks down, during the fusion process as bone grows across the interspace between the vertebrae. Dr. Cetas testified that Irvine's x-rays indicated bony fusion, or at least bony deposition, between Irvine's C5 and C6 vertebrae. Based on those images, Irvine's history, and his reported symptoms, Dr. Cetas concluded that his neck and arm pain was most likely caused by compression at C7, not by a nonunion at the C5-C6 level.

When Irvine reported continued pain following the 2011 surgery, Dr. Cetas testified that he had not ruled out additional surgery to try and alleviate Irvine's symptoms but he thought it prudent to wait. He explained that the fusion surgery at the C6-C7 level was still recent, and that Irvine's vertebrae needed more time to fuse. He also stated that, in the context of treating chronic pain, repeated surgeries can actually create additional problems for the patient, including "failed back surgery syndrome," where patients develop even more debilitating chronic pain that is very difficult to treat.

Dr. Richard Osborn worked at the Portland VAMC as a radiologist at the time Irvine received treatment there. In September of 2011, approximately three months after Dr. Cetas's surgery at the C6-C7 level, Dr. Osborn examined x-rays of Irvine's neck. He reported that Irvine's "[v]ertebral bodies are normal height and are in proper alignment. There is fusion at C5-C6 with obliteration of the disc space. At C6-C7, there is a metallic spacer." (Def. Ex. 510.) Dr. Osborn testified that the obliteration of disc space combined with a lack of any bone spur growth suggested that there was a fusion sufficient to prevent any movement of the joint at that level.

Dr. Jack Simon was the chief of radiology at the Portland VAMC in 2011, and he interpreted an MRI of Irvine's neck in February of that year. He testified about his written report which indicated Irvine had a bulging disc at C6-C7 that was causing the spinal cord to flatten and was narrowing the neural foramen (the pathway through which the nerve roots exit the spinal cord) at the C6-C7 level on Irvine's right side. (See Def. Ex. 503.) Dr. Simon also testified that he was not assessing whether Irvine had a fusion at the C5-C6 level because that finding is typically made by an x-ray or CT scan, not an MRI.

Dr. Erik Foss was the radiologist at OHSU who interpreted the x-rays of Irvine's neck taken before his visit with Dr. Yoo in 2012. Dr. Foss testified that when he wrote in Irvine's medical records that he observed "osseous interbody fusion at C5-C6," he meant that he saw "bone growing between the two portions . . . the c5 and c6 vertebral bodies. So where the disc is supposed to be, I see bone growing between it." Dr. Foss explained that these notes indicate his belief that there was a bony union between the C5 and C6 levels of Mr. Irvine's neck.

Defendant's expert, neurosurgeon Dr. Jeffrey Johnson, testified that Irvine was a complex patient and that he believed Dr. Cetas and the VA neurosurgical team met the standard of care in trying to treat his symptoms. Dr. Johnson reviewed the MRI images in Irvine's file and stated that there was one specific place showing nerve root impingement—the right side at C6-C7. He explained that the C7 nerve root is one of the most common levels where patients have problems, and that patients with an issue at C7 often report pain in their shoulder blade, down the back of their arm and into their hand, especially the middle fingers of the hand. He also stated that C7 controls triceps strength, including pushing strength and grip strength. Dr. Johnson noted that Irvine reported many of those symptoms.

Dr. Johnson also provided insight on how doctors approach treating patients through spinal surgery. He explained that spine surgery works best when the treating doctor looks to correlate something abnormal on the imaging with the patient's symptoms or physical findings on exam, rather than simply trying to "fix the images." Virtually every adult, Dr. Johnson said, would have some evidence of some degenerative changes in the cervical spine, even people who have never experienced neck or back pain. Dr. Johnson stated that while images of Irvine's cervical spine showed evidence of previous surgery and other degenerative changes at the C5-C6 level, his physical manifestations did not match up with those abnormalities. He stated that he believed Dr. Cetas and the VA neurosurgery team "did a good job" of correlating Irvine's reported symptoms with the imaging evidence in diagnosing nerve root compression at C7 and recommending the ACDF procedure at that level.

Finally, Dr. Johnson testified that he did not believe that there was any need for Dr. Cetas to perform any further diagnostic work up to assess the possibility of a nonunion at C5-C6 prior to performing surgery at the C6-C7 levels. He explained there was no evidence that any of Irvine's symptoms the VA neurosurgery team was trying to treat were caused by a nonunion. Dr. Johnson testified that he reviewed Irvine's medical records from the VA and from OHSU, including his MRI and x-ray images, and that he did not see any evidence of a nonunion at the C5-C6 level or any evidence of nerve root compression there. Dr. Johnson stated that his opinion was based in part on a comparison between images taken of Irvine's neck at flexion (that is, when the patient tucks chin-to-chest), extension (when the patient stretches chin toward the ceiling) and neutral views. Dr. Johnson explained that any motion, or lack thereof, by the spinous processes (the fins or levers that stick out along the back of the spine) at each of the different views of Irvine's neck is a strong indicator of whether a particular vertebral level had

successfully fused. Dr. Johnson then testified that the distance between the spinous processes at the C5 and C6 levels did not show movement between the flexion, extension, and neutral views, which indicated fusion at that level. Dr. Johnson also examined x-rays of Irvine's neck and testified that he observed boney growth bridging the space between the C5 and C6 vertebrae, yet another indication that there was, in fact, union at C5-C6.

Irvine's expert, an orthopedic surgeon, Dr. Michael Steingart, testified that he believed Irvine "did not have a full union of the C5-6 level." (Designated Deposition Testimony, ECF No. 64-1, at 15.) He based his opinion on a review of approximately fifty pages of Irvine's medical records. Dr. Steingart stated that he relied on two MRI exams, one from 2011 and one from 2008—although he also testified that he had difficulty accessing Irvine's images on his computer and was only able to review a portion of the available films in forming his opinion. Dr. Steingart also based his opinion on a radiologist's report from November of 2011 which indicated "[s]table degenerative disc disease with loss of disc height" at the C5-C6 level. (Designated Deposition Testimony, ECF No. 64-1, at 17–18.) Dr. Steingart testified that "[t]he radiologist reported a degenerative disc at C5-6. I base my conclusions that a fused bone should not have discs between it . . . ." (Designated Deposition Testimony, ECF No. 64-1, at 18.) Dr. Steingart also explained that he saw disc material between the C5-C6 joint on one of the MRI images he saw, and that indicated to him that there was not a successful fusion at that level. (Designated Deposition Testimony, ECF No. 64-1, at 22.)

Dr. Steingart then testified that he believed the VA providers should have done further diagnostic work to assess the status of the union at C5-C6, and that the failure to do so fell below the standard of care. Dr. Steingart also testified that a refusion surgery is the treatment of choice

for nonunion, though he clarified that the decision whether to perform a refusion surgery was outside of his area of expertise. (Designated Deposition Testimony, ECF No. 64-1, at 38–39.)

Dr. Vaishali Phalke is the neuroradiologist who interpreted the MRI of Irvine's neck at the Portland VAMC in November of 2011. (Def. Ex. 512.) She testified about her statement on the report that she observed "stable degenerative disc disease." She stated that she was commenting primarily on the existence of "unchanged endplate and uncovertebral spurring," and that she was not making any findings that there was disc material present. Dr. Phalke stated that she was describing changes Irvine's cervical spine, and that "degenerative disc disease" was simply a reference to the degenerative changes at Irvine's C5-C6 level. She testified that she was not making any findings about whether Irvine had a fusion or a nonfusion at C5-C6 because she was interpreting an MRI, and fusions are better diagnosed through CT scans or plain film x-rays.

Although it is not reflected in his pre-operative chart notes, Dr. Yoo testified that he believed that MRI and x-ray images showed that "there was no bony union across the segment" at C5-C6. (Designated Deposition Testimony, ECF No. 64-2, at 9–10.) Dr. Yoo stated that during the surgery he performed on Irvine's neck in 2012, he physically manipulated Irvine's neck; the C6-C7 level did not move, but at the C5-C6 level, Dr. Yoo found "a very small amount of movement." Dr. Yoo explained that, considering the MRI and x-ray images and the movement at the joint, he believed that Irvine had a "fibrous union" at the C5-C6 level, meaning that dense fibrous tissue, not bone, was stabilizing the joint. A fibrous union, Dr. Yoo explained, is "not what, ideally, we want. But often it is enough of stability that patient can live with it[.]" (Designated Deposition Testimony, ECF No. 64-2, at 21–22.) Dr. Yoo also testified that he reviewed the radiographic studies done at the VA and that, based on his limited review, he

believed that the VA doctors met the standard of care in treating Irvine's symptoms. (Designated Deposition Testimony, ECF No. 64-2, at 22.)

3. Existence of Nonunion at C5-C6

The Court finds it more probable than not that, at the time Dr. Cetas performed surgery on Irvine's neck in 2011, Irvine's C5 and C6 vertebrate were, in fact, fused. In reaching this conclusion, the Court finds the testimony from Defendant's expert, Dr. Johnson, and testimony from Drs. Foss and Cetas more credible than testimony from Irvine's expert, Dr. Steingart, or testimony from Dr. Yoo.

Dr. Johnson examined x-rays of Irvine's neck and determined that there was evidence of bone growth across the interspace between Irvine's C5 and C6 vertebrae. Furthermore, Dr. Johnson testified that x-ray images showed a lack of movement between Irvine's C5 and C6 vertebrae, another indicator that there was, in fact, bony union of those vertebral bodies. Those findings are consistent with Dr. Cetas's evaluation of Irvine's images prior to conducting surgery, as well as with OHSU radiologist Dr. Foss's analysis of x-rays of Irvine's cervical spine in 2012. Dr. Steingart, on the other hand, only examined MRI images of Irvine's neck. There is no dispute among any of the experts who testified at trial or through deposition that an x-ray is preferred over an MRI for determining whether vertebrae had fused following surgery—even Dr. Steingart admitted that x-rays are a better medium than MRI for demonstrating bony fusion.

Dr. Steingart's opinion that Irvine did not have a fusion at C5-C6 was based in large part on his interpretation of Dr. Phalke's interpretation of Irvine's MRI. The Court finds the first-hand interpretations of x-ray images of Irvine's cervical spine offered by Drs. Johnson, Foss, Simon, and Cetas carry more evidentiary weight.

Although Dr. Yoo testified that he believed there was a nonunion at C5-C6 level, his pre-operative notes only reflect a nonunion at C6-C7. Dr. Yoo did not mention nonunion at C5-C6 until after he performed surgery on Irvine's neck. Moreover, when Dr. Yoo physically manipulated Irvine's neck during surgery, he found slight movement at C5-C6 but no movement at C6-C7. That finding conflicts with his pre-operative diagnosis that Irvine's x-rays showed nonunion at C6-C7 and calls into question the efficacy of Dr. Yoo's physical manipulation in correctly diagnosing whether there was bone growth across these interspaces. Accordingly, the Court is unwilling to credit Dr. Yoo's physical manipulation test as conclusive evidence of nonunion because it conflicts with his own interpretation of the radiographic evidence, and with the conclusions of other doctors, specifically Drs. Foss and Johnson, who reviewed Irvine's x-rays and found evidence of bony union at the C5-C6 level.

CONCLUSIONS OF LAW

Irvine's claim alleging that medical providers at the VA were negligent in attempting to treat his symptoms is brought under the Federal Tort Claims Act ("FTCA"). The FTCA waives the Government's sovereign immunity for, among others, "personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment[.]" 28 U.S.C. § 1346(b)(1). The law of the state in which the alleged negligent act occurred controls actions brought under Section 1346. See 28 U.S.C. §§ 2672, 1346(b)(1); Bond v. United States, No. CIV. 06-1652-JO, 2008 WL 655609, at *1 (D. Or. Mar. 10, 2008).

To succeed on a medical malpractice claim under Oregon law, Irvine must show "(1) a duty that runs from the defendant to the plaintiff; (2) a breach of that duty; (3) a resulting harm to the plaintiff measurable in damages; and (4) causation, i.e. a causal link between the breach of

duty and the harm." Swanson v. Coos Cnty., No. CIV. 08-6312-AA, 2009 WL 5149265, at *5 (D. Or. Dec. 22, 2009) (quoting Stevens v. Bispham, 316 Or. 221, 227, 851 P.2d 556, 560 (1993)).

Under Oregon law, "[a] physician licensed to practice medicine or podiatry by the Oregon Medical Board has the duty to use that degree of care, skill and diligence that is used by ordinarily careful physicians in the same or similar circumstances in the community of the physician or a similar community." ORS § 677.095. When the standard of care of a medical professional is at issue, expert testimony is typically required because "what is reasonable conduct for a professional is ordinarily not within the knowledge" of a lay person. Getchell v. Mansfield, 260 Or. 174, 179, 489 P.2d 953, 955 (1971).

Additionally, "[a] plaintiff must establish a causal relationship between the conduct and the harm to support a recovery in a personal injury case, and the evidence must be sufficient to establish that the relationship is reasonably probable, not simply possible." Harris v. Kissling, 80 Or. App. 5, 9, 721 P.2d 838, 841 (1986) (citing Feist v. Sears, Roebuck & Co., 267 Or. 402, 407, 517 P.2d 675 (1973)). "In Oregon, 'cause' means 'cause in fact,' which 'generally requires evidence of a reasonable probability that, but for the defendant's negligence, the plaintiff would not have been harmed.' " Cain v. Bovis Lend Lease, Inc., 817 F. Supp.2d 1251, 1279 (D. Or. 2011) (quoting Joshi v. Providence Health Sys. of Oregon Corp., 198 Or. App. 535, 538–39, 108 P.3d 1195 (2005)).

In a medical malpractice case based on a theory of the defendant's nonfeasance, i.e. a "failure to diagnose," a plaintiff must allege facts that, if proved, will establish "circumstances which rendered the failure harmful." Moser v. Mark, 223 Or. App. 52, 58, 195 P.3d 424, 427 (2008) (citation omitted); see also Horn v. Nat'l Hospital Ass'n, 169 Or. 654, 670, 131 P.2d 455,

461 (1942) (explaining that in a failure to diagnose case, "the last necessary element in the chain of causation is that the absence of medical or surgical treatment at that time resulted in damage which would not have occurred if the treatment had been administered.").

Assuming, for the sake of analysis, that Irvine had a nonunion at the C5-C6 level, the Court concludes that Irvine has failed to show by a preponderance of the evidence that the VA neurosurgery team's failure to diagnose nonunion violated the standard of care.

Irvine testified that his chief complaints were radicular pain, or as he described it, a sensation of "shards of glass" radiating into his right hand, a lack of grip strength in his right hand, and numbness in his right arm. In attempting to treat those symptoms, Dr. Cetas viewed an MRI of Irvine's cervical spine that showed impingement at the right C7 nerve root. Dr. Johnson explained that C7 compression is a common problem, and that patients with C7 impingement often report "shards of glass" pain radiating down their arm and into their hand and a lack of grip strength. While Irvine's MRI may have shown other incidental abnormalities, the Court finds convincing Dr. Johnson's testimony that the optimal way to treat spinal patients through surgery is to attempt to match abnormalities that appear on imaging with the patient's reported symptoms. Irvine was not reporting the typical pattern of symptoms of a nonunion—that is, localized neck pain that radiates up into the head, and none of the radiologists who viewed images of Irvine's cervical spine diagnosed a nonunion at that level. The Court credits Dr. Johnson's testimony that Irvine's reported symptoms and imaging simply did not indicate that further diagnostic workup to assess whether Irvine had a nonunion at C5-C6 was necessary.

Although Dr. Steingart testified that he believed that the standard of care required the VA neurosurgery team to conduct further tests to determine the cause of Irvine's pain, I find Dr. Johnson's testimony more credible for several reasons. First, Dr. Johnson viewed both MRI and

plain film x-rays of Irvine's cervical spine; Dr. Steingart only viewed an MRI, which all the experts who testified in this case agree is not the proper modality for diagnosing nonunion. Dr. Steingart also relied on the apparent presence of disc material between the C5 and C6 levels to determine there was not a fusion. But Dr. Johnson testified that he did not see any disc material and that, in any event, the presence or absence of disc material is not a criterion for assessing fusion. Additionally, Dr. Johnson is a board-certified spinal surgeon who, as a part of his practice, is required to make similar diagnostic and treatment decisions as the VA neurosurgery team did in this case. Dr. Steingart is not a board-certified neurosurgeon, and he does not make the types of diagnoses or perform the type of surgery that is at issue in this case.

 Finally, the Court notes that Dr. Yoo's decision to perform a more extensive surgery or his diagnosis of a nonunion or fibrous union at C5-C6 in 2012 does not mean that Dr. Cetas's treatment decisions in 2011 where negligent. Dr. Yoo's diagnosis seemed to be based primarily on his physical manipulation of Irvine's neck during surgery; Dr. Cetas's diagnosis and treatment decision was based on Irvine's reported symptoms and images of Irvine's cervical spine. All of the medical testimony suggests that Dr. Cetas's diagnostic approach was fully within the standard of care, and again, all of the radiologists who examined Irvine's x-rays believed there was a bony union at C5-C6. The Court declines to hold Dr. Cetas accountable for "failing to diagnose" a condition that was only made evident after surgical incision. Second, Dr. Yoo's more extensive C4-C7 surgery was based on a different set of facts than Dr. Cetas's decision to operate only at the C6-C7 level—Dr. Yoo had the benefit of knowing that Irvine was still suffering symptoms after Dr. Cetas's surgery. The Court cannot reasonably find a violation of the standard of care by simply comparing treatment decisions made almost a year apart under different factual circumstances.

Faced with Irvine's reported symptoms, imaging showing compression at the C7 nerve root that is known to cause many of those symptoms, radiographic imaging suggesting bone growth between C5 and C6, and that Irvine was not demonstrating symptoms of nonunion, the Court concludes that Irvine has failed to show by a preponderance of the evidence that the VA neurosurgery team violated the standard of care by failing to diagnose nonunion at C5-C6.

## CONCLUSION

In sum, after evaluating the evidence and testimony in this case, the Court finds it more probable than not that there was bony fusion of Irvine's C5-C6 vertebrae prior to Dr. Cetas's surgery on Irvine's neck in 2011. The Court further concludes that even if there was nonunion at C5-C6, the VA neurosurgery team's failure to diagnose nonunion did not violate the standard of care because there was no indication that the nonunion was the cause of Irvine's neck and arm pain. The Court finds in favor of Defendant United States Department of Veterans Affairs and against Plaintiff Don Scott Irvine on all of Irvine's claims.

IT IS SO ORDERED

Dated this __8__ day of __OCT__, 2015.

_____
MARCO A. HERNÁNDEZ
United States District Judge